Good morning, your honors. May it please the court, counsel. My name is John Bergman. I have the honor of representing Oscar Jeff Brownfield, who I will refer to in this argument as Jeff because that's the name he goes by. My co-counsel is Mr. Lish Whitson. Mr. Brownfield is present in court. We're here on an appeal from a granting of a motion for summary judgment dismissing Mr. Brownfield's claims for relief under the Americans with Disabilities Act, the Family Medical Leave Act, and the First Amendment at the district court level. What I'm going to say primarily is that there were questions of fact resolved by the trier of fact, by the district court judge, that exceeded his authority on a motion for summary judgment. That's what we're here about. I want to focus first on the ADA. Was that our test? What's our standard of review? The standard of review is did the judge, a summary, I have to go back to the basis for a summary judgment, summary judgment, are there are no issues of material fact that would be a summary judgment. So it's a standard. It's a standard. All right. Not abuse of discretion or anything of that nature. It's whether there's an abuse. So why don't you get to it? Are there material facts in dispute here? Well, yes, Your Honor. Excuse me. No problem. No problem. Let's just go there. I mean, my worry is that I know we're here on summary judgment, but I guess the real review is if we're going to deal with whether the district court erred in dismissing the ADA claims, I guess we have to determine under the ADA an employer must demonstrate business necessity before ordering the employee to submit to medical examination. That's right in the regulations. Well, I guess I'm trying to determine how one could suggest in this particular matter that there from this circuit. Well, I've read those cases, but applying the facts of this case, I'm still having a trouble. Well, it's my job. Undisputed facts established that the plaintiff demonstrated a pattern of highly emotional responses to a number of situations. His reaction to Merriman and Amos, self-reported problems regarding his memory, stress of divorce and calls made to law enforcement by his ex-wife, the incident with the officer on September the 1st of 2005, the reports from the officer regarding his hopelessness, resounding statements, seeming to lose his temper, concerns about possible continuing efforts, effects of head injury, and poor judgment in participating in martial arts competition after the injury. I have a tough time suggesting that that doesn't meet the to order an employee to submit to a medical exam. And I submit that the fact that he may have had emotional responses, which may have been appropriate under immediate circumstances, some of which I'm going to contest during my argument, is not the standard. The standard is under Yin. Did he have job performance? The trial court did exactly what you have just summarized. I looked at what the trial court did first. Being an old trial judge, I put this down. I said, OK, I'm going to go to the record and see if it happened. I went to the record and it was there and there I was. All right. Let me just review some of these facts with you, if I may. First of all, background. This is a decorated police officer. I appreciate that. And he was doing a substantially good job. He and another officer started the YPAL program in Yakima. He was teaching kids in the DARE program at high schools. He was dealing with the youth. He was being commended throughout his service from when he returned back to work in 2001 until 2004, 2005, when this whole thing arose. What happened? And that's the thrust of our case. The general case here is that there was retaliatory conduct here by the chief of police. Do we have a hot document that says that? No, we don't. OK, let me make that very The Merriman Confrontation on May 11th. The background of that is that in June of 2004, Jeff had already sent an email to the chief asking him to be able to talk with him about an issue. There was no response to that. There were problems that Jeff perceived, which were a matter of public concern. I'm going to state that now because it relates to the First Amendment argument. But YPAL is funded by donations, private grants, and contributions, public grants, funds. Those funds, Jeff found, were not being properly accounted for. There were bad checks being written. The other officer who was working with him on that program, Officer Dijonette, was not spending the amount of time he's supposed to be spending on that case. He still had over 250 unresolved fraud cases that he was still working on part-time. He wanted to get these issues raised to the people above him that could do something about it. His chain of command was Sergeant Amos, Lieutenant Merriman, Captain Copeland. He went, he sent all of these emails. He documented what his problems were. They're in the record. In May 5, I think, or May 4 of 05, a week before this Merriman incident, he sent them to the chief in an email. The day before, he has a sit-down with his sergeant, Sergeant Amos, and he's saying, I need to see the chief about this. And Jeff's understanding, when he goes to the meeting with Merriman, is, I'm going to go meet the chief on May 11th at 9 o'clock or whatever time it was. He walks in there, and here's Lieutenant Merriman and Sergeant Amos, who the day before had told him he was going to have a meeting with the chief, sitting across him with the documents that he had previously sent to the chief. And it gets confrontational. And Jeff reacts. He's afraid because he's dealing with someone who he knows, DeJarnett is a personal friend of Lieutenant Merriman. Merriman and Amos are across the table. He gets upset. He asks for a timeout. It's denied. He has no union rep with him at this point in time. He probably should have gone to anger management school at that point. He should have. You know, I'm not going to excuse his conduct, okay, on that point in time. He gets up, and he gets angry. He leaves. He sees Sergeant Merriman, or Sergeant Amos, later. He cusses at him. He's in bad shape. He's upset. He's angry. And he leaves because he's told to leave. The question under the Yin standard is, did that cause a substantial, or was that evidence of a substantial inability to perform the duties of his office? Was, did Yin involve a police officer? No, it did not. Not to my knowledge, if I have the facts correct. There was an internal investigation. He was found to have, you know, abused his, disobeying his officer. And he was put on, he was suspended. It was a disciplinary proceeding. He was suspended for 24 hours. That's what was the result of that. He continued with his job through the rest of the summer. And then in August of 05, we have this incident where he calls in, he's stopping a suspected felon for a traffic stop. The Yakima police procedures require that he call for backup. He calls for backup. A Sergeant Watts, who was not at the scene, after the fact, wrote what she said Jeff told her. That, that there was a seven-year-old boy or eight-year-old boy that was, was yelling at him. And he was upset by it. The facts are, Officer Stevens responded to that call, the backup call. And what, and what his report was, is not so. There were adults arguing with him and screaming at him. There was a 12-year-old boy who was getting very confrontational. And Officer Stevens reported in the follow-up to that, that Jeff Brownfield's conduct was appropriate. Captain Copeland admitted that he had to call for backup because that's part of the Yakima Police Department procedurals for that particular kind of a stop when a felon is involved. Nothing happened. It did not prevent him from yelling at him. And he said he was upset. He could feel himself losing control. His, his legs were shaking. And the children were taunting him. I mean. That's what Sergeant Watts wrote down in her post-incident report. So, so you're saying what? That, that she did not record the facts accurately. She was, she was biased. Well, she may have, I don't know. I can't say that she was biased, Your Honor. I can say that she was not there. She was recording her interpretation of what Brownfield was calling about. And there was, there were more than, than a 7 or 8-year-old boy there. In fact, it was a 12-year-old boy. But there were adults who were confronting him. And the important part that I would like to emphasize is that Officer Stevens, who responded to assist him, spoke nothing but high praise for Jeff handling of that matter. The next incident, Officer Salinas. A dust-up in, in the muster room or something. Is this the September 18th incident? It is, Your Honor. Domestic violence one? No, no, no. Officer Salinas, I think, is September 1. The two of them get into an argument. The sergeant says, hold it. Come on out. Let's talk about this. They calm down. Jeff Brownfield apologizes on the scene. Officer Krieger says that Officer Salinas, the other officer, was the one who was escalating this argument. The, there is a, an internal investigation as a result of this. And Captain Copeland was frank to admit, I've never seen one called for in such a situation. It's unusual. But there was a, he was cleared of any improper conduct as a result of that. And the sergeant who called him out was interviewed in the course of that. She said in her report, since the incident, they go about their business. They back each other up. They do their job. They do their job. That meets the, the yen standard. Let me ask you this. Officer Brownfield was involved in an automobile accident. Correct. Well, he was involved in two accidents. It depends upon which one you're talking about. December 2000? Yes. And broken vertebrae and had some head injuries? That's correct. Was there another accident after that? There was another accident. And it was during the course of the internal, or the fitness for duty exam, Dr. Decker reported to Dr. D'Andrea, who was on this side of the mountains. And in the course of driving over there, he was involved in another accident. Soft tissue injury, primarily. Okay. The, the events that we've been talking about here so far that you've been filling in the blanks, so to speak, for us, are those all after the December 2000 accident? Yes, Your Honor. What, what was this officer's record before the accident? What was it like? Well, it was short. First of all, he was hired in 1999. The first review that he had in 2002, January of 2002, is in the record. I'm not going to read it all, but it was positive. It was positive. He's doing a good job. What had he done before he came to the military? Yes. You know what, Branch? No. Okay. I would, as long as you brought that up, in July of 2001, what happens, it's a December accident, he goes back to work in He had some, he did have an injury to his head, a closed head injury. He had a fracture at C5-6 that was corrected by effusion. The residuals were, he had some visual spacing problems. He had some weakness, left-sided weakness, Your Honor, due to the blow to the right side of his head, muscular weakness. He had to strengthen that. He did that, obviously, because he was engaging in martial arts at a later period of time. Emotionally, he was fine. And Dr. Drew said, there's no reason I can see why he can't go back to work so long as he works on strengthening that left leg, deals with his visual problem. He had some speech problems. He took therapy for the speech problems. He completed it. Nothing happened adverse to his job performance in that three to four year period of time until 2005. Would you describe the events that occurred after the December 2000 accident as consistent or inconsistent with his actions in the time as an officer prior to that? Would you repeat the question? Would you describe the events that we've been describing here, all of which you tell me were after the December 2000 accident, were those events consistent or inconsistent with his behavior and performance as a law enforcement officer before the accident? Under my interpretation of those events and under what the factual basis that we submitted in opposition to this motion for summary, I'd say yes. Consistent. Consistent. I mean, he was okay. He was doing his job. I mean, he, you know. But counsel, what I don't understand is it seems to me that as you answer these questions and as you make your case incident after incident, it seems almost that you're arguing against your own proposition, namely that there was no business necessity for conducting these examinations. I mean, this is extreme behavior. I mean, this is not like an isolated incident. I mean, we have to practically have an inventory control on the incidents. There were five that were relied upon by the court, not by us. Okay? Well. I have told you about three. I just want to note, you're way over time and I want to keep your answer to my question brief. I'll let you answer your question because that's the last answer unless somebody else has another question. Did I answer the question? Well, I just said keep your answer brief. I was just calling to your attention. Those factual incidents, we think, are the pretext to get Jeff to a fitness for duty examination. All right. Thank you. All right? Thank you. Thank you, Your Honor. And I have to apologize for taking his vote. May it please the court. Counsel, my name is Jerry Moberg. I'm here on behalf of the city of Yakima and all defendants in this case. I think that the first issue that I would like to address involves the question of business necessity because I think the judge properly held that there was a business necessity for the referral in answer to I think one of the questions Your Honor had was I think up until about 2004, Mr. Brownfield had not exhibited these behaviors of sudden outbursts, excessive anger, shaking of hands and feet, and the things that were detailed by Captain Copeland when he referred Brownfield to Dr. Decker. Frankly, it was between May of 2005 and September 28th of 2005 when all these incidents. Yes, they were in a focused period of time and several things were happening. He was involved in a divorce action that caused some problems. He actually had gone to his doctor who treated him after the 2000 accident and reported to him, although I don't believe in the record that Mr. Brownfield reported this to his employer, but when he went to his treating doctor, he said, you know, these are the concerns. This anxiety you're having at work, this frustration, these are the concerns I had back in 2000 because I wanted you to do this treatment program and you didn't do it and they are perfectly predictable from the closed head injury that he had in 2000. Let me ask you one other question about this, which is of some situation. If I go through and I engage in the litany of those things that happened to this young man from May 2005 to September 2005, it was at that point he was referred to Dr. Decker, as I understand it. Yes. And Dr. Decker suggested that he was not psychologically fit to continue. That's correct. It's my understanding he was not discontinued at that time, but that he was not terminated, but instead they allowed him to seek another opinion from his own doctor. Yes. And what was his own doctor's opinion? Well, interestingly enough, his own doctor, Dr. Marr, agreed with Dr. Decker and concluded that he was not psychologically fit. That's what I understood. Then after that, as I understand it, his employer again said, well, why don't we have another examination and let's put this to rest, and at that point he refused to complete that examination. That's correct. What happened was there was a long period of time, from 2005 until 2007, where he saw Dr. Decker. He objected to Dr. Decker's objectiveness, although I think the record supports she was very qualified in this field. They said, fine, then you get your doctor to show us something else. Dr. Marr agreed with Dr. Decker, and then by then it's in Mr. Zace's hands, the city manager. He's having to make the decision, is Officer Brownfield, who had good service for the city for a long period of time, but in this short period of time had concerning behaviors, is Mr. Brownfield psychologically fit for duty? I have two doctors who said they weren't. Mr. Brownfield says, well, but we don't think that's a fair evaluation. He says, fine, here's what I'm going to do. We're going to send you back, originally it was back to Dr. Decker, for a review of Dr. Marr's report to see if it changed her mind. Mr. Brownfield then files a complaint against Dr. Decker, threatening to sue her for medical malpractice. And would not go back to see her. And would not go back to see her. It's then he went to see a Dr. Miller, right? Went to see a Dr. Ekimo, and what had happened was that Mr. Zace said, all right, we really can't send you back to Decker given the state of affairs. We're going to pick a new doctor, which was agreeable to both sides. We're going to send you to Dr. Ekimo. We'll be bound by Dr. Ekimo's report. We want to get an answer to are you psychologically fit for duty. If you are, we'll put you back to work. If you're not, we can't. What about Dr. Miller? When does he, when does Dr. Miller? Dr. Miller is a hired expert, was not hired for treatment or any other purpose, was hired for the purpose of the trial. And what the plaintiffs did during the case was they sent the records to Dr. Miller, and he did a records review and simply wrote back and said, I don't think I would have done the same thing Dr. Decker did. He never saw Mr. Brownfield. He never treated Mr. Brownfield. He didn't see him. He didn't examine him. But aren't your arguments really about what Dr. Miller said, are they not just questions of fact? No, I don't believe they are, because Dr. Miller never concluded that he was fit for duty. I think it might create a question of fact if Dr. Miller said, I've done an evaluation and I conclude he is psychologically fit for duty. Now we have a question. But he never concluded that. He just said, I don't know that I would have done the same thing these doctors did. And ethically, he could not make a psychological fitness for duty determination without examining his patient and without getting the full history. So what Zace was faced with was two doctors, qualified doctors saying he's psychologically not fit for duty, ordering to Dr. Ekimo to find out. Mr. Brownfield goes to the first half of the evaluation and then chooses not to return, despite very clear in writing statements to him that it would be insubordination and you would likely be terminated if you don't complete this examination. He didn't, and that was the reason that he was terminated. I think that with regards to business necessity, the one thing I want to point out to the court is I don't think we get to substitute our judgment for that of Captain Copeland in business necessity. I think what we have to look at is this is a police officer, and I think the case law supports that it's firefighters and police officers. There's a heightened sort of test in terms of I think in Yen it was a tax advisor or a tax consultant, and we're not dealing with a police officer. Copeland lists out nine very serious concerns that he had about Officer Brownfield, and I think the review there is was it reasonable? Did Captain Copeland reasonably have come to the conclusion it was a business necessity to send Brownfield for an evaluation to assure that he was psychologically fit for duty? I think it is reasonable, and I think it's unrebutted in the record. What about with the FMLA claim? Well, that's a curious claim. What he says is he was put on FMLA leave, which was true. He was first put on administrative leave in January of 2006. He was put on FMLA leave because Dr. Decker concluded he was not fit for duty, so now we have a medical reason for his leave. While he was in the process of this where the second action comes in, while he's in the process of being evaluated by Dr. Decker, he gets in a car accident coming over the pass, and he has some soft tissue injuries. He goes to see Dr. Gondo for the soft tissue injury. Dr. Gondo then writes a release letter saying he's released without restriction to go back to work. Never addresses a psychological issue, so it's apples and oranges, and that's what the trial judge said. So the real reason, I guess, and I followed this because I, of course, read the trial record, but what your argument is that there wasn't a personal physician who ever certified he was fit psychologically for duty. That's your argument. In this record, there is no doctor who was qualified or certified that he was psychologically fit to return to duty. And as I understand it, there's nobody who ever required the defendant or required Mr. Brownfield to take an examination to determine whether he could have FMLA leave, correct? I'm sorry, I don't think I understood your question. There was nobody who ever required the officer to take an examination to determine whether he could have FMLA leave. No, they granted him his FMLA leave based on a request, and his request was based upon Dr. Decker's report and the psychological duty. He didn't request FMLA leave for a shoulder injury. He requested FMLA leave because of the findings that Dr. Decker had made regarding the psychological problem, and therefore in order to reinstate him under doctor's certificate, I believe that you would have to have had a psychologist or psychiatrist say he is no longer under that FMLA disability. He's psychologically fit to return to duty. This record is devoid of that. I'm looking at SER 1 through 6. This is in Yakima's excerpt of the record. Yes. It's a report from Richard Drew, Ph.D. Yes. And on SER 6, it says at the end, there appears to be no reason why Mr. Brownfield cannot return to active duty in a gradual and supervised manner. That was following Dr. Drew treated him from his 2000 head injury accident, and this was Dr. Drew's opinion, the date of which was 2001, permitting him to come back to work after his 2000 accident. I thought you just told Judge Smith that there was no psychological or psychiatric report saying it was okay for him to come back to duty. No, I think if I said that, the record is devoid of any doctor's certificate after he was placed on FMLA leave for psychological and fitness for duty that certifies that he returned to duty. Certainly, and I don't know if he was on FMLA leave in the 2000 time frame or not, certainly we did get a doctor's report to put him back to duty in 2001. By the way, it was Dr. Drew that he went back to in 2004 and said, I'm having these problems at work and at home. I'm irritable. I'm excitable. And Dr. Drew then in 2004, and that's also in the record, said those are the conditions that I addressed in the 2001 report that without treatment you're going to get worse, and that's the concerns I had, and then actually that came to fruition because in 2005 and 2006 we see these behaviors that required the referral. And I think that if you analyze Captain Copeland's decision, I think he had a business necessity, and maybe the proof is in the pudding because when he did refer, they found out that Mr. Brownfield was, in fact, psychologically not fit for duty. While I don't think you can bootstrap it that way, I do think it's evidence to look at in terms of saying, listen, was this really because in 2005 or 2004 he complained about the overtime of his partner, or was this really a legitimate concern Copeland had given the circumstances that this officer was not psychologically fit for duty? And I think the judge said there's really only one conclusion to be raised at that point. The other claim is the First Amendment claim. You mean reached, not raised? I'm sorry, I must have misspoken. Okay. Yeah, I must have misspoken. The other claim that is before the court that was dismissed by the trial judge is the First Amendment claim. And I believe that the judge was correct on two issues. One is I believe that the concerns that he allegedly raised were workplace concerns and that they were not of sufficient public moment to be fully protected by the First Amendment. But then the judge also said, you know, even if there were some public complaints in that, here's the problem you have. Mr. Zais terminated him. The record is there is no record that there was any friction between Mr. Zais and them. We're talking the city manager. The city manager, Mr. Zais. Mr. Zais testified that I make those decisions, I do a complete independent review, and now we're three years after this alleged First Amendment statement and Mr. Zais says I fired him because he was not fit for duty. That's unrebutted in the evidence. And he insubordinately refused to complete the examination. Those are legitimate reasons for termination. And so when you apply the causation standard of the First Amendment claim, I think that the conclusion is that they can't meet the causation standard, that it is clear that the reason for the termination was not these complaints about overtime by his fellow officer, but were because of his insubordination and his unfitness for duty by Mr. Zais, who was removed from Mr. Granato, who he felt had some bias against him, and I think sufficiently removed under the case law of the circuit that his independent decision should be honored and was honored by the trial court. Bottom line is Mr. Brownfield was not psychologically fit for duty. He was insubordinate and wouldn't complete the testing that we had to have him do in order to make any other decisions, and he was terminated for that reason and that reason only. If the court has any questions, I'd be happy to answer them. No, thank you. Counsel, I remember a hearing that I was at in San Francisco where we were in an on-bank proceeding, and I remember this especially because it was an Idaho case, and counsel got up and argued, one of the counsel, and there was another counsel from Idaho, all of those my friends who got down there, but the first counsel took all the time, and so when the other counsel got to the end and we were at rebuttal, he had no more time, and the chief judge said, Sorry, buddy, you should have gone with your first guy, and he should have shut up sooner. You don't get any time. I felt bad for that old Idaho guy because I had all those Idaho friends of mine out there, so I'll give you a minute because I don't want to be in Kaczynski's. I don't know if it's appropriate, but I'll yield. I'll give you a minute. The gentleman from Yakima yields. The gentleman from Yakima yields. That's good. Actually from Euphrata. I'll give you a minute to sum up what he said because there were a lot of issues your co-counsel did not really get a chance to address. I think you can do it in a minute. Your Honor, I can. I can do it in less than that. Okay. All right. Please read our reply brief. Please read our reply brief. It answers each of the points that was just made, and unfortunately my esteemed counsel misstated some of the facts, and I think you'll see that if you review that brief. Thank you very much. Thank you. All right. Case 0935628, Brownfield v. Yakima, is submitted. We thank counsel for their argument, and we thank you for a wonderful day and appreciate counsel helping us make the right decisions in these very tough cases. Court is adjourned. All rise.
judges: Lucero, Hawkins, Smith N. R.